## CIRCUIT COURT OF CAROLINE COUNTY

James E. Gates et al.

v.

Clifford Copson et al.

March 31, 1989

Case No. CH87-000115

By JUDGE WILLIAM H. LEDBETTER, JR.

The issue in this case is whether the structure on Copson's lot in Lake Caroline is a house trailer within the meaning of the restrictive covenants of the subdivision.

Lake Caroline is a residential subdivision located in Caroline County. Pursuant to paragraph 2 of the restrictive covenants recorded in 1968, "house trailers" are prohibited.

Copson is the owner of a lot in that subdivision. When he placed the structure in question on his lot, the Gateses, who are neighboring landowners, filed this suit to enforce the covenant.

The Gateses contend that the structure is a house trailer in violation of the covenant. Copson claims that the structure is a modular home and is permitted.

The case was tried on March 15, 1989. Many facts were stipulated. Both sides presented witnesses and other evidence. At counsels' request, the court deferred decision pending submission of memoranda. Both parties filed memoranda on March 29th.

The subject of the controversy is a factory-built home consisting of two modules, or sections, manufactured by Sterling Manufactured Homes of Albemarle, North Carolina. It is built to the standards of the BOCA Code and bears

a label to that effect. Each section of the home has an attached steel chassis and was transported to the site on wheels with axles. At the site, the two sections were joined together on thirty to forty cinder-block piers resting on eighteen-inch footers. The structure does not rest on a load-bearing perimeter foundation. However, a nonload-bearing concrete wall set on footers was built around the perimeter of the structure to give the appearance of a conventional foundation. The on-site assembly and related work took four men four to six weeks to complete. The home, which measures 28 feet by 60 feet, cost $59,800.00 and is financed by a conventional thirty-year mortgage loan.

Before the structure was delivered to the site, construction plans were submitted to the County building official and a building permit was issued. Also, plans were submitted to the Lake Caroline Property Owners Association and approved, although that approval apparently was withdrawn. Neither the Association nor its architectural review committee has taken legal action to have the structure removed.

In his testimony, Gates cited several features of the structure in support of his position that the home is a prohibited house trailer, including the slant of the roof, the size of the windows and doors, the metal chassis, the lack of a load-bearing foundation wall, and the fact that the units were transported to the site on wheels with axles, rather than on flatbed trucks.

The Gateses ably argue that the term "house trailer" as used in the 1960s, for all intents and purposes, embraces "mobile homes," "double-wides," and "manufactured homes" of the 1980s. The terms have changed, they say, but the idea remains essentially the same.

The Gateses are correct that restrictive covenants are to be interpreted in an ordinary or popular and not a legal or technical sense, and the court is to gather the intent of the covenant from surrounding circumstances with regard to the object which the covenant was designed to accomplish. In their memorandum, the Gateses quote at length from *Wilmoth v. Wilcox*, 734 S.W.2d 656 (Texas, 1987).

The issue in *Wilmoth* is similar to the issue in

this case. In interpreting the term "house trailer" in a deed restriction, the Texas court said:

> The words used in the restrictive covenant must be given the meaning which they commonly held as of the date the covenant was written, and not as of ' some subsequent date. Our task is to determine the intent of the framers of the restrictive covenants. Did they intend that the term "house trailer" should be limited to the type of house trailers which was built at that time, . . . or did they intend the term to include the generic successors, i.e., "manufactured homes"? The record shows that the term "house trailer" acquired an undesirable connotation resulting in a concerted effort by the industry to change its image. In the late 1960s, the term "mobile home" began to replace the term "house trailer." In the late 1970s, the industry applied the term "manufactured homes" to the products, replacing the name "mobile home." The Texas Manufactured Housing Standards Act . . . defines the term "mobile home" and . . . the term "HUD-Code manufactured home." The definitions are identical except that a mobile home was constructed prior to June 15, 1976, and a manufactured home is one constructed subsequent to June 15, 1976, according to the Rules of the United States Department of Housing and Urban Development. This is essentially a distinction without a difference.

Accordingly, the court held that the prohibition applied to house trailers, mobile homes, and manufactured homes.

This court has no quarrel with the analysis in *Wilmoth*. Interpreting the term "house trailer" with regard to the object which the covenant was designed to accomplish, a "house trailer" as that term was popularly used in the 1960s embraces mobile homes, double-wides, and manufactured homes of the 1980s.

But the analysis does not answer the question: Is the Copson structure a trailer, mobile home, or manufactured home, or is it something else?

Today there are three broad categories of housing construction methods: conventional or "site-built" structures, manufactured homes, and industrialized housing. Conventional homes are not pertinent to this inquiry; the other two categories involve factory-built structures, and the differences between those two methods of construction requires discussion.

"Manufactured home" is more than just a "generic successor" to the term "house trailer," although a prohibition against one would seem to include a prohibition against the other. In any event, as used today, "manufactured home" has a more technical definition, intended to distinguish such units from "industrialized housing." Manufactured homes are factory-built under regulations adopted by HUD pursuant to the National Manufactured Home Housing Construction and Safety Standards Act of 1974 (42 U.S.C. § 5401 et seq.). Although HUD has the ultimate responsibility for formulating and enforcing regulations under the Act, the Virginia Department of Housing and Community Development has been designated by HUD to enforce these federal standards with respect to such homes manufactured in Virginia. Virginia has enacted the Virginia Manufactured Housing Construction and Safety Standards Act (Virginia Code § 36-85.2 et seq.). (Unlike the Texas statutes referred to in *Wilmoth*, the Virginia Act contains no definition of "mobile home.")

In essence, the operative term now under state and federal law is "manufactured home," defined as follows:

> "Manufactured home" means a structure subject to federal regulation which is transportable in one or more sections; is eight body feet or more in width and forty body feet or more in length in the traveling mode, or is 320 or more square feet when erected on site; is built on a permanent chassis; is designed to be used as a single-family dwelling, with or without a permanent foundation, when connected to the required utilities, and includes the plumbing,

heating, air-conditioning, and electrical systems contained in the structure. § 36-85.3.

Industrialized buildings are not subject to federal regulation. Virginia's Industrialized Building Safety Law (Virginia Code § 36-70 et seq.) defines an industrialized building as follows:

> "Industrialized building" means a combination of one or more sections or modules, subject to state regulations and including the necessary electrical, plumbing, heating, ventilating, and other service systems, manufactured off-site and transported to the point of use for installation or erection, with or without other specified components, to comprise a finished building. Manufactured homes defined in § 36-85.3 . . . shall not be considered industrialized buildings . . . . § 36-71.

At bottom, then, manufactured homes, the successors to house trailers, double-wides, and mobile homes, are now regulated by federal law. A HUD label or seal is applied to such units at the manufacturing site. Manufactured homes must be constructed and assembled in conformance with the federal regulations. Certain aspects of the federal laws also deal with transportation, distribution, and sale of such units.

In the Virginia Code, the definitions of "mobile home" in the Motor Vehicle Act (§ 46.1-1(38)) and in the Mobile Home Lot Rental Act (§ 55-248.41(A)) have been changed to match the definition of "manufactured home" in the Virginia Manufactured Housing Construction and Safety Standards Act, quoted above. Therefore, it is clear that the terms "mobile home" and "manufactured home" are essentially interchangeable, with use of the former giving way to the latter.

Industrialized homes, on the other hand, are factory-built according to state law. In Virginia, that means that these structures are built in compliance with the statewide building code, the BOCA Code. The factories are inspected by, or on behalf of, the state agency, and each such unit must bear a BOCA Code label or seal. At

the site, local building officials inspect and approve assembly and set-up.

The evidence establishes that structures manufactured pursuant to the requirements of the BOCA Code are qualitatively superior to federally-regulated manufactured homes or mobile homes. However, the division line is not always distinct. Many of the same factories produce both "BOCA-built" homes and "HUD-built" homes, and some of the top-of-the-line "HUD-built" homes are essentially as well constructed and appealing as some of the lower-priced "BOCA-built" units.

Nevertheless, the distinction exists and it is a real and meaningful one. For instance, lending institutions are willing to make thirty-year amortized conventional mortgage loans for "BOCA-built" structures but do not make such loans for "HUD-built" structures. Local zoning laws also reflect the distinction, at least in application.

These statutes regulating the construction of factory-built housing units are not dispositive of the issue in this case, viz. the interpretation of language in a private covenant. Nevertheless, they are relevant and helpful in determining current usage of words and phrases which may or may not be "generic successors" to the term "house trailer."

Against this backdrop of legislation and modern practices, the conclusion is inescapable that there is a well-established significant difference between factory-built housing units that bear the BOCA Code label and those that do not.

The court does not agree that the term "house trailer" should be defined by reference to the mode of delivery of the unit to the site, or by the slant of its roof, or by the size of its windows and doors, or by the type of foundation (i.e., piers versus load-bearing perimeter wall) employed. Such bright line distinctions would be unworkable and, in any case, surely are quite remote to the intentions of the drafters of the covenant.

Described above, the Copson structure was built according to the standards of the BOCA Code, the same code that governs conventional construction. Although it was transported to the site on a steel chassis with wheels and axles, it has been assembled on piers resting on conventional-style footers, with a perimeter wall to

give the appearance of a load-bearing foundation. Its on-site assembly and set-up have met the zoning and building codes, and its purchase price has been financed by a conventional thirty-year mortgage. The court is of the opinion that the "house trailer" restriction was not intended to exclude such a structure from the subdivision.

Accordingly, the relief sought in the bill of complaint will be denied and the bill dismissed.

The defendants filed a cross-bill requesting an award of attorney's fees and costs. The suit, they argue, is frivolous.

The suit is not frivolous, nor was it instituted or prosecuted for purposes of harassment, vexation, or hindrance. As evidenced by the length of this opinion alone, the issue presented was fairly debatable and required research and deliberation for resolution. The fact that the complainants' view did not prevail does not entitle the defendants, under our system, to reimbursement of their costs and expenses associated with the litigation.

Accordingly, the relief sought in the cross-bill will be denied and the cross-bill dismissed.